## Case No. 9,101.

### The MARQUETTE.

[Brown, Adm. 364; 4 Chi. Leg. News, 241; 6 Alb. Law J. 292.] [1]

District Court, E. D. Michigan. Feb. 13, 1872.

SALVAGE—SPECIAL CONTRACT FOR PROPORTION OF PROPERTY SAVED—HOW FAR A SALVOR IS AN AGENT OF THE OWNER.

1. A wrecking company which had undertaken to raise a sunken schooner and deliver her at Detroit for six-tenths of her value when so delivered, hired of libellant, for a fixed compensation, certain divers, diving armor, and wrecking apparatus. *Held*, that libellant, having knowledge of the contract between the wrecking company and the owners of the schooner, could not maintain a libel in rem, and that the subsequent ownership of six-tenths of the schooner by the wrecking company could not

relate back to the time of its contract with the owners, so as to affect their interests.

[Distinguished in The Louisa Jane, Case No. 8,532.]

2. A salvor by contract is not an agent of the owners, and cannot create against them or the property saved, any liability beyond the contract price.

3. A contract for a compensation to be paid at all events, whether the property is saved or not, creates a mere personal obligation, and no lien attaches on account of it.

[Distinguished in The Louisa Jane, Case No. 8,532. Cited in The Murphy Tugs, 28 Fed. 430.]

[See Baker v. The Tros, Case No. 783.]

The Marquette was sunk in the Straits of Mackinaw by a collision, and abandoned by her owners to the underwriters, and there lay sunken in about fifteen fathoms of water. The underwriters contracted with the Northwestern Wrecking Company, a corporation organized under the laws of Ohio for the raising of sunken vessels, to raise the Marquette, and place her in Clark's dry dock, in the city of Detroit, for six-tenths of the vessel. The Northwestern Wrecking Company entered upon the performance of their contract under the charge and supervision of Milo Osborne, and after working at the wreck for several days, found that on account of the great depth of water in which the wreck lay, the services of a diver were necessary. The libellant, who was also in the wrecking business, was then engaged in raising a wreck in Beaver harbor, near Beaver island, a few miles distant from the wreck of the Marquette. He had divers in his employ, and owned and had in use the necessary diving armor and apparatus, a hand pump, a steam pump, etc., adapted to the purposes of wrecking. He was also the patentee of a new invention for raising sunken vessels, which consisted mainly in sinking casks filled with water, and then, after being fastened to the vessel, inflating them with air by the use of a steam pump and connecting tubes or pipes, and thus expelling the water and giving the casks a lifting power. Osborne, who was in charge of the work for the Northwestern Wrecking Company, applied to and obtained of the libellant a diver and the necessary armor and apparatus, including a hand pump. After working a short time it was found that the hand pump was not sufficient for the divers to operate with safety in so great a depth of water, and Osborne returned the hand pump and obtained libellant's steam pump. After working a few days longer, and not making much progress, Osborne returned to libellant with the diver, apparatus and pump, and had a settlement with him up to that time, and paid libellant what was then found to be his due, at the rate of $50 per day with the hand pump, and $75 per day with the steam pump, less a small deduction made by libellant at the request of Osborne. Osborne desired the use of the diver, etc., longer, but complained

1 [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission. 6 Alb. Law J. 292, gives only a partial report.]

that they could not afford it at the price charged by libellant. A new arrangement was then entered into, and Osborne returned to the Marquette, with two divers who were in the employ of the libellant, the necessary armor and apparatus, and the steam pump, and taking with him, also, some of libellant's casks, to be used on his patented plan, and had the same for use in raising the wreck, thirty-four consecutive days, and until the vessel was finally raised. The divers, etc., were actually used twenty-eight, and were idle six out of the thirty-four days. It is for this use, under the new arrangement, that the libellant brought this suit against the vessel. During this time the libellant came along where the company were at work, on his way to Cleveland, with the vessel he had been raising, and left a small vessel called the Barbour, and his chains, anchors, additional casks, etc., and the same were used by the company to some extent, but no additional claim is made for such use. On the Marquette being raised, she was taken to Detroit by the Northwestern Wrecking Company, and placed in Clark's dry dock, in complete fulfillment of their contract with the underwriters, and its interest of six-tenths in the vessel, her boats, etc., thereupon accrued to them, and the company intervened, and put in its claim and answer for the protection of that interest.

W. A. Moore, for libellant.

Where a lien has been created it will not be released except upon the clearest proof of an intention to release it. Moore v. Newbury [Case No. 9,772]; The Kimball, 3 Wall. [70 U. S.] 37; Peyroux v. Howard, 7 Pet. [32 U. S.] 325, 345; The A. D. Patchin [Case No. 87]; Dike v. The Joseph [Id. 3,908]. Failure to prosecute by one set of salvors does not inure to the benefit of the salvors who do prosecute, but to the owners. Evans v. The Charles [Id. 4,556].

H. B. Brown, for claimant.

It is unnecessary to consider whether if libellant's contract had been made directly with the owners for a sum certain, he could sustain a lien. He certainly could have no claim for salvage as such, for that is a contingent claim, and some of the cases would indicate he could have no lien upon the vessel. The Mulgrave, 2 Hagg. 77; The Independence [Case No. 7,014]; Adams v. The Island City [Id. 55]; Bondies v. Sherwood, 22 How. [63 U. S.] 214; The Susan [Case No. 13,630]; Hennessey v. The Versailles [Id. 6,365]. Libellant was a subcontractor, and clearly had no lien. Purinton v. Hull of New Ship [Id. 11,473]; Smith v. The Eastern Railroad [Id. 13,039]; Southwick v. The Clyde, 6 Blackf. 148; Hubbell v. Denison, 20 Wend. 181; Burst v. Jackson, 10 Barb. 219; The Whitaker [Cases Nos. 17,524, 17,525]; Harper v. New Brig [Case No. 6,090]; Ames v.

Swett, 33 Me. 479; Squire v. One Hundred Tons of Iron [Case No. 13,270].

LONGYEAR, District Judge. The libellant and Osborne, both of whom were sworn as witnesses and testified in the case, agree that the divers were in the employ of the libellant, and that he was to be paid for their services, as well as for the use of the armor, apparatus, pump, etc. They also agree that libellant's compensation was not dependent upon success, but that he was to be paid at all events, whether the vessel was raised or not. It is true they do not say this in so many words, but the version which each gives of what the contract was under the new arrangement, admits of no other construction. They are also agreed as to the time, viz., thirty-four days, and that twenty-eight of those were working days, and six of them they were idle. The main facts upon which there is any disagreement are as to whether there was a fixed rate of compensation agreed upon, or whether it was left to a quantum meruit, and as to whether the libellant knew or was informed of the character or capacity in which the company was operating, that is, that they were operating as contractors, and not as owners.

The libellant claims that the rate of compensation agreed upon was $75 per day when working, and half price, or $37 50, per day when idle. On this basis he claims as follows:

| | | |
|---|---|---|
| 28 working days at $75 | ............. | $2,100 |
| 6 idle " " 37 50 | .......... | 225 |
| Total | .................... | $2,325 |
| Less payment conceded | .......... | 310 |
| Leaving a balance of | ............. | $2,015 |

—For which, with interest from October 1st, 1870, libellant claims a decree in his favor against the vessel. On the other hand, the company claims that no fixed rate of compensation was agreed upon, but, on the contrary, that when Osborne complained that they could not afford to pay $75 per day, libellant told him to take the divers, etc., and use them, and he would be reasonable with them, or words to that effect, and that that was the agreement as to compensation. But, without pursuing this disputed point further now, I will proceed to the other disputed fact. And here I must hold that libellant had notice of the character or capacity in which the company was operating. Libellant, in his testimony, says, "I understood the Northwestern Wrecking Company had taken the job to raise the vessel, and had failed. I did not know how much they had taken the job for." He understood, then, that the company was not operating as owner, but had undertaken the raising of the vessel as a "job," and the only point as to which he professes not to have been informed was how much they were to receive for the service. This is sufficient alone to settle this point. But there is further testi-

mony which I think places it beyond all doubt that libellant knew, not only that the company was operating as contractor, but also the terms of the contract. Osborne, after producing in evidence the contract (which was in writing) between the Northwestern Wrecking Company and the underwriters, testifies positively and explicitly as follows: "I made known to Captain Falcon that we had such a contract; that I deemed it a good one, and that I wished him to go in with me and share in the results, etc. That was at the time we were at Beaver harbor. He replied that he wanted nothing to do with the wreck—that he wanted the money. He said they were slow things to realize from. I told him we were to have six-tenths, and that she ought to be raised in a very short time—we deemed it a good contract." In this Osborne is not contradicted. On the libellant being recalled to the witness stand, and asked if any such conversation took place, he says, "none that I recollect;" and this is all the denial he makes, which in fact is no denial.

But it is contended, on behalf of libellant, that the Northwestern Wrecking Company were in fact part owners of the vessel to the extent of the six-tenths which they were to have under their contract with the underwriters, in case of success, and which finally accrued to it. I cannot agree to this. The company was operating precisely the same as any salvors under a contract, and the agreement as to the six-tenths was simply fixing the quantum of compensation, in lieu of leaving it for after consideration between the parties, or to be determined by the court. Besides that, it was wholly conditional upon success, and it accrued to it only from the time the contract was fully performed. By no known principle of law or in reason can it be held to relate back to any previous period so as to affect the interests of those who were owners of the vessel at the time the contract was entered into. The company must therefore be held to have sustained the relation of contractor merely at the time the agreement between libellant and Osborne was entered into.

The case, then, is that of a person having rendered a service to salvors for a compensation to be paid at all events, who were themselves operating under a contract with the owners, known to such person, claiming and seeking to enforce a lien upon the vessel saved, independently and irrespectively of such latter contract, and of the compensation as fixed by it. The learned advocate for the libellant has referred the court to no adjudicated case in which this was allowed to be done, and to no authority or even dictum to that effect; and after a careful investigation, the court has been able to find none. On the contrary, the authorities are all the other way. The case of The Whitaker [Cases Nos. 17,524, 17,525] and that of Squire v. One Hundred Tons of Iron [Case No. 13,270], are quite analogous to the present case. Both cases were in fact more favorable to the libellant than the present. In the case of The Whitaker, Holbrook, the original contractor, after vain efforts to get the vessel off, gave the job over entirely to one Otis, who knew of the contract. Otis, at an expense largely beyond the contract price, succeeded in getting the vessel off, and then libeled her for his pay. Judge Sprague dismissed the libel, for the reason that Holbrook, the original contractor, was not made a party. Afterwards, upon a new libel, in which Holbrook was joined, the court granted a decree to Holbrook and Otis, jointly, limiting them to the original contract price, although it was less than half what Otis had expended. In that case also Otis' compensation was dependent upon success, while in the present case, as we have seen, libellant was to be compensated at all events. In the case of One Hundred Tons of Iron [supra], libellant had loaned to the owners seven large blocks, to be used by them in endeavoring to get their vessel off the beach, at $5 per day, with an express stipulation that the vessel should be responsible for hire and damage and for the return of the blocks. The hire not having been paid, and the blocks having been lost, libellant brought his suit, in rem, against 100 tons of iron which was of the cargo, and had been recovered from the vessel. Judge Blatchford dismissed the libel, not only on the ground that a pledging of the vessel was not a pledging of the cargo, but mainly on the broad ground that the libellant had no claim whatever as a salvor, giving as a reason that the hire of the blocks was for a fixed compensation, which was to be paid at all events, whether the vessel was saved or not, which is exactly the present case, according to the libellant's own theory. In that case also, it is to be observed, the contract was made with the master of the vessel, and it purported to pledge the vessel for its fulfillment, and yet the court held that the libellant could not recover in the admiralty, either in rem or in personam. In this case, not only was the contract not made with master or owner, but the libellant expressly refused to have anything to do with the wreck.

I think both of these cases are sustained by authority, as well as on principle. The case of The Whitaker [supra] was decided on the principle that a salvor by contract, like the Northwestern Wrecking Company in this case, is not an agent for the owners, and cannot create against the owners or the property saved any obligation or liability beyond the contract price; or, it may be added as applicable to this case, a different mode of payment than that expressed in the contract; and I think there can be no dispute as to the soundness of that doctrine. The most that the court could do, in any event, would be to let the libellant in to

share the contract price with the original contractor. But the court cannot do that in this case without making a new contract for the parties, because, as we have seen, libellant expressly refused to share the contract price or have anything to do with the wreck at the time the agreement between him and the company was made. The case of One Hundred Tons of Iron was decided on the principle that the hiring, as in the present case, was for a compensation to be paid at all events, whether the vessel was saved or not. The same principle was also stated and acted on by Judge Sprague in the case of The Whitaker in deciding another branch of the case than that above alluded to. See, also, The Independence [Case No. 7,014], where the same doctrine is enunciated by Judge Curtis in the following language: "In my judgment, a contract to be paid at all events, either a sum certain, or a reasonable sum, for work, labor, and the hire of a steamer or other vessel in attempting to relieve a vessel in distress, without regard to the success or failure of the efforts thus procured, is inconsistent with a claim for salvage; and when such a contract has been fairly made, it must be held binding by a court of admiralty, and any claim for salvage disallowed." See, also, The Camanche, 8 Wall. [75 U. S.] 448, 477.

It must be understood that the nature of the claim as a salvage claim is not changed simply because the service was rendered by contract. It is well settled that the nature of the service as a salvage service is not changed for that reason alone (see the opinion of the court in the case of The Silver Spray [Case No. 12,857], decided by this court at the present term, and the cases there cited). It is because that by the contract the compensation is to be paid at all events, whether the property is saved or not, that a claim for salvage cannot be maintained. Such a contract creates a mere personal obligation, and no lien attaches on account of it.

I hold, therefore, that the libellant in this case cannot maintain a suit in rem in this court, for the reasons: 1st. That the services having been rendered under an agreement with a contractor itself operating for a specific compensation, and not with the master or owner of the vessel, he cannot, in any event, maintain a suit against the vessel, except by joining with such original contractor and sharing with it the compensation so agreed upon between it and the owners. 2d. That he could not maintain such suit in this case, because, by the very terms of his agreement, he was not so to share. 3d. That he was to be paid at all events, whether the vessel was saved or not. The libellant undoubtedly has a remedy against the Northwestern Wrecking Company in some form of action, but not in this.

Having arrived at these conclusions, it is unnecessary to determine the specific compensation the libellant was to receive, whether a per diem, or a quantum meruit, or how much. The libel must be dismissed, with costs; but, inasmuch as the merits of the case as between the libellant and the Northwestern Wrecking Company are not decided, it must be without prejudice as between them. Libel dismissed.

See The Williams [Id. 17,710].